IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**GILBERT MELENDREZ,**

       **Plaintiff,**

vs.                                                                                                                 No.  05cv0837 DJS

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Melendrez') Motion to Reverse and Remand for a Rehearing **[Doc. No. 11**, filed November 22, 2005, and fully briefed on January 11, 2006. On May 19, 2005, the Commissioner of Social Security issued a final decision denying Melendrez' application for supplemental security income benefits.  Melendrez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to reverse or remand is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Melendrez, now forty three years old (D.O.B. 03/17/1963), filed his application for supplemental security income benefits on October 9, 2003, alleging disability since August 7, 2003, due to depression, arthritis, problems with his back and feet, and alcoholism. Tr. 13. Melendrez has a high school education and two years of college.  He has no past relevant work. *Id.*  On May 19, 2005, the Commissioner's Administrative Law Judge (ALJ) denied Melendrez

benefits.  Tr. 14.  The ALJ found that Melendrez' "musculoskeletal impairment involving his back" and his "psychological impairment" were not severe.  Tr. 14.  However, the ALJ found Melendrez' other impairments severe (status post fracture of the left ankle, degenerative joint disease of the right ankle secondary to previous trauma, post status hammertoes, right foot, and hypertension).  *Id.*  The ALJ also found that these  impairments did not meet or  medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.  *Id.*  The ALJ found Melendrez retained the residual functional capacity (RFC) to "lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk at least 2 hours in an 8 hour day, sit about 6 hours in an 8 hour day, and push, pull, and perform gross and fine manipulation without significant limitation."  Tr. 17.  Melendrez filed a Request for Review of the decision by the Appeals Council.  On June 28, 2005, the Appeals Council denied Melendrez' request for review of the ALJ's decision.  Tr. 4-6.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Melendrez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of

impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Melendrez makes the following arguments: (1)  the ALJ's erred  at step two of the sequential evaluation process when he found that his mental impairment and back pain were not severe; (2) the ALJ erred in conclusively relying on the Medical Vocational Guidelines (the grids) to find him not disabled.; and (3) the ALJ erred in assessing his credibility.

## A.  Depression as a Severe Impairment at Step Two

Although a severe impairment must "significantly limit an individual's physical or mental ability to do basic work activities[1]," 20 C.F.R.  § 416.921, the Tenth Circuit has held that this is a "de minimus" showing <u>at step two</u> of the five-step sequential evaluation process.  *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir.1997) (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988)*; see Bowen v. Yuckert*, 482 U.S. 137*,* 158 (1987)(Supreme Court adopted what is referred to as a "de minimus" standard with regard to the step two severity standard:  "[o]nly

---

[1] Basic work activities are "abilities and aptitudes necessary to do most jobs," 20 C.F.R. §416.921(b), including "walking, standing,  sitting, lifting, pushing, pulling, reaching, carrying or handling;  seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions;  use of judgement, responding appropriately to supervision, coworkers, and usual work situations;  and dealing with changes in a routine work setting."  Social Security Ruling 85-28, 1985 WL 56856 at *3.

those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the sequential evaluation process.). Nonetheless, a "claimant must show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997). To meet this burden, the claimant must furnish medical and other evidence to support his claim. *See Bowen v. Yuckert*, 482 U.S. 137, 146 & n. 5 (1987). The step-two severity determination is based on medical factors alone, and "does not include consideration of such vocational factors as age, education, and work experience." *Williams*, 844 F.2d at 750.

The agency regulations set forth the process for evaluation of mental impairments. *See* 20 CFR §§404.1520a; 416.920a. The agency is required "to consider . . . all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." *Id*. §§ 404.1520a(c)(1); 416.920a(c)(1). The claimant's impairment is then rated by its effect on four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id*. §§ 404.1520a(c)(3); 416.920a(c)(3). The ALJ is required to document his evaluation of these functional factors in the body of his decision, *id.* §§ 404.1520a(e); 416.920a(e), making specific findings as to the evidence relied upon and the degree of limitation in each of these areas, *id.* §§ 404.1520a(e)(2); 416.920a(e)(2).

The ALJ applied this four-part test to conclude that Melendrez' depression was not severe at step two. The ALJ found as follows:

> Previously completed PRTF's found that the claimant had a nonsevere psychological impairment under sections 12.04, 12.08, and 12.09 (exhibit 3F).

> In the current case, treatment notation indicate that the claimant has a history about global abuse and depression. Taken notations indicate that while the claimant did have problems with depression, they were largely situational and improved with medication (Exhibit 1F, p. 26). One recent notations show increased problems with alcohol abuse. A consultative examination performed by Dr. Schutte found that the claimant suffered alcohol dependence, cannabis dependence, cocaine abuse, a depressive disorder, and an antisocial personality disorder. It was Dr. Schutte's opinion that these impairments imposed largely mild limitations on the claimant's functional capacity, although he felt that the claimant' s anti-social personality disorder produced a moderate impairment on social functioning (exhibit 2F).
>
> In the current case, treatment notations do not reflect evidence of an anti-social personality disorder as noted by Dr. Schutte. This is relevant since there are numerous treatment notations concerning the claimant's substance abuse and depression. The claimant's depression has responded well to treatment with medication.
>
> SSR 96-6p provides that the findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the Administrative Law Judge and Appeals Council levels of administrative review. Administrative Law Judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.
>
> As noted above, two prior State agency assessments concluded that the claimant did not have any severe functional limitations associated with his psychological impairments. Considering these findings as well as the evidence of a good response to treatment with antidepressive medication and the lack of medical documentation concerning an anti-social personality disorder, other than Dr. Schutte's assessment, the Administrative Law Judge concurs that (sic) [with] the assessment of the State agency physicians and mental health experts. Therefore, the Administrative Law Judge concludes that the claimant has a mild restriction of activities of daily living ; mild difficulty in maintaining social functioning; and mild difficulty maintaining concentration, persistence, or pace. There are no episodes of decompensation. Thus, the claimant's psychological impairment is not severe.

Tr. 14. Melendrez challenges the ALJ's findings regarding his depression on several grounds. First, Melendrez contends the ALJ relied "on one page of one exhibit" to support his finding that his depression was "situational and improved with medications." Mem. in Support of Mot. to Reverse at 4. Melendrez claims the report the ALJ relied upon is from an unacceptable medical source because it was written by a nurse practitioner. Second, Melendrez contends the ALJ "is not qualified to determine the characteristics of his depression." *Id.* at 5. Third, Melendrez

contends the ALJ discounted the consultative examiner's opinion.  Finally, Melendrez contends the ALJ "failed to discuss [his] account of how his mental impairment affects his functioning."  *Id.* at 7.

A review of the record indicates multiple entries addressing Melendrez' depression by his health care providers.  **On October 2, 1997**, Melendrez went to La Clinica de Familia with various complaints.  Dr. Flores diagnosed Melendrez with mild depression and hypertension. Tr.144.

On **May 21, 1998**, Melendrez returned to La Clinica de Familia complaining of depression.  Tr. 138.  Melendrez reported he had lost his job and his girlfriend of two years had ended their relationship.  Melendrez complained of insomnia and loss of appetite.  Melendrez also reported he had suffered from depression in the past but had not been treated for it.  The health care provider assessed Melendrez with "Depression-situational" and prescribed Zoloft 50 mg in the morning, recommended exercise and family counseling.  The nurse practitioner directed Melendrez to return in two weeks.

On **January 20, 1999**, Melendrez returned to La Clinica de Familia for a follow-up of his hypertension and depression.  Tr. 136.  Melendrez reported his father had recently died.  The nurse practitioner prescribed Zoloft 50 mg and directed him to return in two weeks.

On **January 29, 1999**, Melendrez returned for his follow-up.  Tr. 136.  Dr. Crespin noted Melendrez had a "long standing history of depression" and "**difficulty holding jobs secondary to severe symptoms and episodes of anger**."  *Id.*  Melendrez reported he did not take the Zoloft because he could not afford the medication.   Dr. Crespin prescribed Zoloft and in parentheses

indicated "Share the Care."  This may have been a program that would help Melendrez pay for his medication.  Dr. Crespin directed Melendrez to return in two weeks.

On **February 12, 1999**, Melendrez returned for his follow-up.  Tr. 139.  Melendrez reported he was doing well.  The physician directed Melendrez to continue taking the Zoloft and return in one month.

On **February 26, 1999**, Melendrez returned to La Clinica de Familia with complaints of chest pain for four days.  Tr. 132.  Melendrez reported "his depression was doing better, feeling OK."  *Id.*  Melendrez told the nurse practitioner that the physician "was thinking about putting him on another medicine that may help him quit smoking along with treating his depression."  *Id.*  The nurse practitioner stopped the Zoloft and prescribed Wellbutrin.  The nurse practitioner gave Melendrez 60 samples of Wellbutrin and directed him to return in one month.

On **April 9, 1999**, Melendrez returned to La Clinica de Familia.  Tr. 131.  The nurse practitioner noted, "Mood appears brighter, appears more optimistic."  *Id.*  The nurse practitioner directed Melendrez to continue taking the Wellbutrin and return in three months.

On **July 19, 1999**, Melendrez returned to La Clinica de Familia and reported he had not heard from the agency that was to provide counseling ("Went for LCDF counseling at SW, 'haven't heard from them.'").  Tr. 129.

On **January 24, 2000**, Melendrez returned to La Clinica de Familia with complaints of depression. Tr. 121.  Melendrez reported being stressed at home.  Melendrez reported a loss of appetite and stated he had been drinking a lit bit more than normal.  Melendrez also reported he was feeling down and had thought of killing himself the previous week.  Melendrez reported going to group therapy at Southwest Counseling and requested medication for his depression.

The nurse practitioner prescribed Zoloft 50 mg and advised him to continue with counseling at Southwest Counseling.

On **February 2000**, Melendrez returned to La Clinica de Familia with complaints of "stomach flu." Tr. 114. Melendrez reported he was drinking and had experienced an increase of side effects with Zoloft.

In **early February 2002**, Melendrez starting receiving his health care at St. Luke's Health Care Clinic, a clinic for homeless, unemployed, or underemployed individuals. On **February 13, 2002**, Melendrez went to St. Lukes for his first visit. Tr. 237. He reported he had been on Zoloft for many years. On February 18, 2002, Melendrez returned to St. Luke's. The nurse referred Melendrez to Southwest Counseling for his Zoloft. *Id.*

On **March 25, 2002**, Melendrez returned to St. Luke's. The nurse noted Melendrez had been referred to Southwest Counseling for Zoloft and counseling.

On **July 8, 2002**, Melendrez returned to St. Lukes. Tr. 235. On that day, the health care provider noted: "Refuses to go to SWC (Southwest Counseling) due to monetary charges– unable to pay– feels he is "over depression" since it had been 3 years ago that his many relatives died and divorced." *Id*.

On **August 21, 2002**, Melendrez returned to St. Lukes with complaints of headaches. Tr. 234. The nurse practitioner assessed Melendrez with hypertension, mild headaches, depression, GERD (gastroesophageal reflux disease), and allergies. The nurse practitioner referred Melendrez to Southwest Counseling.

After **August 21, 2002**, Melendrez returned to St. Lukes several times. However, nothing is noted regarding his depression until December 31, 2003. Tr. 227 ("Referred to SWC for depression). At that time, the health care provider did not document any complaints.

On **March 29, 2004**, someone made the following entry: "Referred [to] SW or J. Funk S.W. (social worker) to apply for other programs. Referred to SWC— does not go. Been drinking all week & so told to go to SW for their programs." Tr. 224. On that day, Melendrez received Zoloft 25 mg instead of 50 mg due to his drinking.

The next visit to St. Lukes was not until **June 23, 2004**. Tr. 223. Melendrez requested refills of all his medications and for follow-up on a recent accident. Melendrez reported he was on Celebrex, Zoloft, Zyrtec, Flonase, Norvasc, and ranitidine. The physician examined Melendrez and assessed him with hypertension, GERD, depression, eczema, and left ankle fracture. The physician prescribed Norvasc, ranitidine, Celebrex, and Zoloft.

On **November 3, 2004**, the physician assessed Melendrez with depression but noted Melendrez "declines referral to SWC." Tr. 220.

The record indicates Melendrez met his "de minimus" burden to show that his depression was a severe impairment <u>at step two</u> of the sequential evaluation process. Additionally, Dr. Schutte, a psychologist, evaluated Melendrez and submitted a Psychological Source Statement of Ability to do Work-Related Activities on **January 6, 2004**. Dr. Schutte is considered an examining agency consultant and a specialist. Dr. Schutte opined Melendrez was **moderately limited** in his ability to work without supervision, **moderately limited** in his ability to interact with the public, **moderately limited** in his ability to interact with coworkers, and **moderately limited** in his ability to interact with supervisors. However, the ALJ dismissed Dr. Schutte's

opinion, noting that "treatment notations do not reflect evidence of an anti-social personality disorder as noted by Dr. Schutte." Tr. 14. An ALJ may not substitute his own opinion for a medical opinion. *See Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993). Notably, the agency's nonexamining consultant, Leroy Gabaldon, a psychologist, adopted Dr. Schutte's assessment and also listed Antisocial Personality Disorder as one of Melendrez' mental disorders in the Psychiatric Review Technique Form. Tr. 162. Scott Walker, M.D., an agency consultant, reviewed the evidence and concurred with Dr. Gabaldon's assessment. Tr. 155. Accordingly, the Court finds that the ALJ erred in disregarding Dr. Shutte's opinion and in finding that Melendrez' mental impairment was not severe <u>at step two</u> of the sequential evaluation process.

### **B.  Application of the Medical Vocational Guidelines**

Nonexertional impairments are medically determinable impairments that do not directly limit physical exertion but may reduce an individual's ability to perform gainful work nonetheless. See 20 C.F.R. § 416.967; *Channel v. Heckler,* 747 F.2d 577, 580 (10th Cir. 1984). If nonexertional impairments narrow the range of possible work the claimant can perform, the Commissioner may only use the Medical Vocational Guidelines (the grids) as a "framework" for determining whether, in light of all claimant's impairments, he has meaningful employment opportunity within the national economy. 20 C.F.R. pt. 404, subpt. P, App.2, 200 (e) (2). In such cases, the Commissioner must also produce a vocational expert to testify whether specific jobs appropriate to claimant's limitations exist in the national economy. *Channel*, 747 F.2d at 581.

Melendrez' depression is considered a nonexertional impairment.  Accordingly, the ALJ erred in conclusively applying the grids and should have consulted a vocational expert at step five of the sequential evaluation process.

On remand, the ALJ should consider Dr. Shutte's opinion, redetermine Melendrez' RFC, and consult with a vocational expert.  However, the Court expresses no opinion as to the extent of Melendrez' mental impairment, or whether he is or is not disabled within the meaning of the Social Security Act.  The Court does not require any result.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.  In all other respects, the Court affirms the ALJ's findings.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**